MARC J. WINTHROP – State Bar No. 63218
mwinthrop@winthropcouchot.com
GARRICK A. HOLLANDER – State Bar No. 166316
ghollander@winthropcouchot.com
JEANNIE KIM – State Bar No. 270713
jkim@winthropcouchot.com
**WINTHROP COUCHOT**
**PROFESSIONAL CORPORATION**
660 Newport Center Drive, Fourth Floor
Newport Beach, CA 92660
Telephone: (949) 720-4100
Facsimile: (949) 720-4111

[Proposed] General Insolvency Counsel for
Debtor and Debtor-in-Possession

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SANTA ANA DIVISION**

In re:

LOCAL CORPORATION, a Delaware corporation,

Debtor and
Debtor-in-Possession.

Case No. 8:15-bk-13153-SC

Chapter 11 Proceeding

**DECLARATION OF KENNETH S. CRAGUN IN SUPPORT OF DEBTOR'S EMERGENCY MOTIONS FOR ORDERS: (A) AUTHORIZING USE OF CASH COLLATERAL; (B) AUTHORIZING: (1) PAYMENT AND HONORING OF PRE-PETITION PAYROLL OBLIGATIONS; AND (2) APPROVING PROPOSED EMPLOYEE RETENTION PROGRAM FOR ESSENTIAL NON-INSIDER EMPLOYEES; AND (C) LIMITING NOTICE**

DATE: June 24, 2015
TIME: 10:00 a.m.
PLACE: 5C
Ronald Reagan Federal Building
and U.S. Courthouse
411 W. Fourth Street
Santa Ana, CA 92701

I, Kenneth S. Cragun, declare and state as follows:

1. I am the Chief Financial Officer of Local Corporation, a Delaware corporation and the debtor and debtor-in-possession in the above-entitled chapter 11 case (the "Debtor") by virtue of its filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code on June 23, 2015 (the "Petition Date"). I am authorized to make this declaration on behalf of the Debtor in support of the Debtor's Emergency Motions for Orders: (A) Authorizing Use of Cash Collateral (the "Cash Collateral Motion"); (B) Authorizing: (1) Payment and Honoring of Pre-Petition Payroll Obligations; and (2) Approving Proposed Employee Retention Program for Essential Non-Insider Employees (the "Payroll Motion"); and (C) Limiting Notice (the "Limit Notice Motion")[1]. The facts stated herein are within my personal knowledge, and if called upon as a witness, I could and would testify competently thereto.

2. I have more than 20 years of senior level financial experience and have been employed as the Debtor's Chief Financial Officer ("CFO") since December 2010. In my role as CFO, I have been responsible for overseeing the financial performance of the Debtors. Consequently, I am involved in supervising all aspects of the Debtor's financial affairs. My duties include, but are not limited to, the following:

a. supervising the individuals responsible for the maintenance and retention of the Debtor's accounting records; and

b. overseeing the preparation of the Debtor's financial reporting, including, without limitation, its balance sheets and income statements.

3. As Chief Financial Officer of the Debtor, I am very familiar with the Debtor's financial books and records, and have reviewed its financial reporting. I also am familiar with the Debtor's business operations.

4. The Debtor, a publicly traded Delaware corporation (NASDAQ symbol LOCM), is a leading local advertising technology company located in Irvine, California, that connects millions of online and mobile consumers with businesses and products through a variety of

[1] Capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Cash Collateral Motion, the Payroll Motion and the Limit Notice Motion.

innovative digital advertising solutions.  The Debtor employs approximately forty-eight (48) people.  In calendar year 2014, the company generated approximately $83.0 million in revenues, $2.4 million in adjusted EBITDA, and a net loss of approximately $5.5 million.

5.    The Debtor was founded in 1999 and went public in 2004.  The Debtor has been one of the fastest growing online local media businesses for a number of years, and for the past four years it has been listed by Deloitte on its Technology Fast 500.

6.    The Debtor is in the business of providing search results to consumers who are searching online for local businesses, products and services.  The search results generated by the Debtor's technology platform consist primarily of local business listings that the Debtor's technology aggregates, indexes, normalizes, and syndicates.  These search results are provided through the Debtor's flagship Local.com website and through other proprietary websites, and they are also delivered to a network of over 1,600 other websites that rely on the Debtor's search syndication services to provide local search results to their own users ("Network").  The Debtor generates revenue from these services through the various ad units that are placed alongside search results, which include pay-per-click, pay-per-call, and display (banner) ad units, including video.  The Debtor's Local.com website has approximately 14 million unique visitors each month ("MUVs"), and its Network syndication services reach approximately 5 million MUVs.

7.    The Debtor's expertise in the areas of local search, search engine marketing, search engine optimization, search syndication/analysis and reporting at large scale, internet indexing and normalizing has enabled the company to develop and deploy new technologies and products.  As of this writing, the Debtor holds thirteen patents, and a number of additional patent applications are pending.  These technologies have enabled the Company to achieve great success in growing the number of consumers that its media reaches.  By the end of 2013, the Company had reached record levels of traffic in the mobile search space.

8.    The growth and profit potential in the Debtor's business space is substantial.  According to BIA/Kelsey, the leading research and advisory company focused on the local advertising marketplace, U.S. local online advertising revenue will reach approximately $137.5 billion in 2014.  The "local search" segment of this revenue total – that is, searches for products,

services and businesses within a geographic region – has become increasingly important to the online advertising industry. Local search allows consumers to search for local businesses' products or services by including geographic area, zip code, city and other geographically targeted search parameters in their search requests – such as entering "florists in Irvine, CA." In this regard, BIA/Kelsey estimates that the local search market in the U.S. will grow from $6.3 billion in 2013, to $8.6 billion by 2017. The Debtor's existing technology platforms and the new products that it is in the process of deploying ideally position the Company to take advantage of this growth trend.

9. The Debtor was forced to file for Chapter 11 relief on the Petition Datedue to a temporary and incidental liquidity problem that could not be bridged within the time available through third party financing. I believe that the Debtor's The instant filing will provide the Debtor the time to maximize value through the sale of its business as a going concern.

10. In calendar year 2014, the Debtor generated $83.0 million in revenues, $2.4 million in adjusted EBITDA, and a net loss of approximately $5.5 million. The Debtor has generated positive EBITDA for eight of the last nine quarters. As of June 22, 2015, the Debtor had approximately $20,000 in cash, $8.4 million in accounts receivables, plus intellectual property assets with significant value.

11. As of the Petition Date, the Debtor anticipates that Fast Pay Partners, LLC (the "Lender") will assert a purported lien against the Debtor's assets in the amount of approximately $2.3 million, Lender under the terms of that certain *Financing and Security Agreement* entered into on March 9, 2015 (the "Loan Agreement"). I believe that Lender will assert a lien against all of the Debtor's personal property.

12. As of the Petition Date, the Debtor had approximately $20 million of unsecured debt. The unsecured debt is comprised of approximately $11 million in accounts payable, and approximately $9 million of unsecured financing.

13. The Debtor's Chapter 11 filing was precipitated by its short term cash flow needs caused by the following developments:

a. Clawbacks. The Debtor's Network partners, including Yahoo and

Google, pay the Debtor based upon the amount of "traffic" that is generated by or through the Debtor's services and technologies. In the first quarter of 2014, the Debtor was anticipating $1.6 million of revenue from these sources based upon "traffic" that was later determined to be of too low a quality to justify this payment. As a result, this $1.6 million in revenue was not collected;

b. Operational Results. Like most growing technology companies, the Debtor periodically expends more cash that it takes in from operations. This "burn" factor is largely attributable to the fact that a significant amount of corporate revenues are expended on developing and enhancing technological platforms and products. Although these platforms and products will generate revenues in the future, the product cost is front-loaded and consequently this product development expense can create, or in this case, add to, a near term liquidity problem.

14. The Debtor's cash and cash equivalents are subject to a purported "lien" in favor of the Lender. This lien secures a credit facility with an outstanding balance of approximately $2.3 million. The collateral base securing Lender's debt includes, but is not limited to approximately $8.4 million in accounts receivable, and a suite of intellectual property assets, which includes thirteen valuable patents.

15. The Debtor projects that it will generate positive EBITDA through post-petition operations, as it has successfully done for the eight of the last nine quarters. Accordingly, I do not expect that the Lender's collateral base will be depleted post-petition.

16. The value of the Debtor's business lies in its technologies, unique products, scalable platforms, extensive partner network, employees, and the thousands of customers and clients who use its services daily. I believe that, in order to preserve and maintain the value of its business for the benefit of its creditors and shareholders, the Debtor must have immediate access to the use of all cash collateral on the terms prayed for in the Cash Collateral Motion.

17. The Debtor's employees deliver a suite of services to thousands of customers and daily, through a series of sophisticated technological platforms. I believe that preserving this

business is critical to the success of the Debtor's reorganization effort and to the Debtor's ability to repay the claims of its creditors. I further believe that to accomplish this end, the Debtor must have the immediate ability to use cash collateral to pay the ordinary and necessary business expenses and charges itemized in the budget ("Budget") attached hereto as Exhibit "1" and incorporated herein by this reference. The Debtor proposes to use cash collateral of the Lender pursuant to the terms and conditions set forth below:

a. Budget. The Debtor will be authorized to make the expenditures provided for in each budget monthly, and if necessary, to exceed the amounts set forth in each respective budget by as much as 15% of budget total; however, if the Debtor's revenues increase, then the Debtor's expenditures may exceed the amount of the expenditures set forth in the respective budget in proportion to the increase in actual revenues from budgeted revenues. Any expenditures in excess of this authorization will require the written approval of the Lender, or further order of the Court after appropriate notice. Budget savings for the Debtor in any month may be carried over and used by the Debtor in subsequent months (i.e., to account for changes in the timing of expenditures by the Debtor). After the expiration of the term of the budget, the Debtor will be able to obtain use of any cash collateral of the Lender by filing and serving an amended budget; if no objection to the terms of such budget is filed within ten (10) days after the service of such budget, the amended budget will be deemed to have been approved. If an objection is filed with the Court and served upon the Debtor, then the Debtor may continue to use cash collected pending a hearing on such objection.

b. Replacement Lien. As and for adequate protection of the Debtor's use of any cash collateral of the Lender, the Lender will be granted a replacement lien in the Debtor's post-petition cash, accounts receivable and inventory, and the proceeds of each of the foregoing, to the same extent and priority as any duly perfected and unavoidable liens in cash collateral held by the Lender as of the Petition Date, limited to the amount of any cash collateral of the Lender as of the

Petition Date, to the extent that any cash collateral of the Lender is actually used by the Debtor.

c. Reservation of Rights. The Debtor, the Committee, once appointed, and all other parties-in-interest reserve any and all rights that they may have to object to the claims of the Lender and to object to the validity, priority and extent of the Lender's liens, if any, encumbering the Debtor's assets.

d. Financial Reporting. The Debtor will provide to the Lender all monthly operating reports required to be submitted to the Office of the United States Trustee, and monthly cash flow reports, broken down by the expense line items contained in the budget, within 25 days after the end of each calendar month following the Petition Date.

e. Final Hearing on this Motion. The Debtor reserves the right to seek, at the final hearing on this Motion, use of cash collateral different from that set forth herein.

18. Based upon the Budget set forth on Exhibit "1," I believe that this Court should authorize the Debtor's use of cash collateral in connection with its ongoing business operations.

19. The Debtor's Chapter 11 filing was precipitated by a cash flow/financing problem, not a core business problem. The Debtor is a well-managed dynamic technology company that has achieved positive Adjusted EBITDA for eight of the last nine quarters, which means that its operations have not been depleting the corporate balance sheet.[2] The Debtor projects that its operating results will continue to be positive at the Adjusted EBITDA level during the period encompassed by the Budget (13 weeks) and thereafter. I believe that these operating results protect the Lender's secured position.

20. I further believe that the Lender's secured position is protected by a substantial equity cushion. The Debtors' receivables base is $8.4 million, and since the Debtor has historically had an average collection percentage of 99% on receivables, the Lender's equity cushion (collateral value over and above its debt) before considering other assets, is 266%. Taking

[2] The cash flow problem was caused by, among things, an unanticipated revenue "clawback."

into account the balance of the Debtor's assets, and the Debtor's intellectual property assets, the Lender's equity cushion increases to a multiple of what it is owed.

21. I believe that, in order to preserve and maintain its business, the Debtor must have the ability to pay the expenses set forth in the Budget. Without this relief, I believe that the Debtor's business will precipitously decline in value, damaging the interests of all creditors and this reorganization effort.

22. I believe that the cash collateral pool securing the Lender's indebtedness will not decline through the usage proposed by herein. To the contrary, I believe that this usage will preserve and increase the overall value of this collateral. The Lender's $2.3 million asserted secured claim is protected by $8.4 million in receivables, resulting in an equity cushion many times its debt total. I believe that this cushion protects the Lender.

23. It is imperative that the Debtor retains the support of its forty-eight (48) full-time, salaried employees (collectively, the "Employees," and singularly, an "Employee") in order to preserve and maintain its ongoing business operations and to meet the needs of its customers. I believe that to retain this support, the Debtor must timely pay and honor, in the ordinary course, all pre-petition payroll and wage related obligations owed to this constituency. The Debtor desires to minimize the potential hardship that the Employees may suffer if the Debtor is not able to retain and properly incentivize its workforce. I believe that without the Employees, the Debtor cannot maintain its going concern value. I further believe that the payment and honoring of the Debtor's obligations to its Employees is necessary to maintain morale, avoid the potential for hardship that an Employee may suffer, and prevent Employees from leaving the Debtor's employ during this critical time for the Debtor.

24. The Debtor must fund its payroll obligations by making payment to Paycom, its third party payroll administrator, on or before June 29, 2015, to pay to Employees for wages, salaries and commission earned from June 16, 2015 through June 30, 2015. This payroll includes the Pre-Petition Compensation earned from June 16, 2015 through June 23, 2015, or the Petition Date. I believe that Employees will leave if they are not paid. Without its workforce, the Debtor's business will suffer immediate and irreparable damage. In contrast, I believe that if the Court

promptly grants the relief sought in the Payroll Motion, the Debtor's business value will be preserved for the benefit of all creditors.

25. I am informed by the Debtor's general insolvency counsel and believe thereon that of the Employees, three (3) are insiders, as that term is defined by the Bankruptcy Code, three (3) are executives, and that the balance of the workforce is comprised of general employees. **The Pre-Petition Wages include compensation to three (3) insiders in this case, but no payments will be made to the insiders until such time as the Debtor's post-petition compensation is authorized to be paid pursuant to the U.S. Trustee Guidelines.**

26. The Employees are paid bi-monthly, on the 15th and last days of the month, two weeks in arrears, by direct deposit. Prior to each payroll date, the Debtor funds the payroll to its Paycom for payment of bi-monthly salaries and benefits to the Employees. On June 29, 2015, the Debtor must fund its payroll obligations related to its next payroll scheduled for June 30, 2015. The amounts to be paid to the Employees on June 30, 2015, are for wages, salaries, commissions and benefits earned between June 16, 2015 through and including June 30, 2015. The aggregate Pre-petition Wages due to Employees will be approximately $176,000 and the aggregate amount of wages, salaries and commissions payable on account of services rendered, post-petition, will be approximately $123,000.

27. On or about March 27, 2015, the Debtor entered into a "Retention Agreement" with forty-one (41) non-insider employees. A true and correct copy of a form Retention Agreement, which mirrors each of the Retention Agreements that has been offered and entered into with each of the retained employees, is attached hereto as Exhibit "2."

28. In anticipation of a potential change in control of the Debtor's business (a "CIC Transaction"), the Debtor entered into the Retention Agreements in an effort to retain employees that the Debtor, by and through its management, believed were critical to the preservation of the Debtor's customers, daily operations, and going concern value of its business. Collectively, these employees have the knowledge and skill necessary for the Debtor to maintain its customer relations and continue developing its technology platforms to the deployment and profitability stages.

29. The key terms of the Retention Agreement provide that, if a retained employee remains in the Debtor's employ through the date that is six (6) months after a CIC Transaction, the Debtor will pay to the retained employee a "Retention Bonus" in the amount of 25% of the retained employee's then-current annual salary. The Debtor agreed to pay to the retained employees the Retention Bonus in addition to the retained employee's annual salary and other bonus amounts payable to the employee.

30. The Debtor has already reduced the number of its employees in efforts to reduce costs. I believe that the remaining employees are necessary to preserve and maximize the value of the Debtor's business and that approval of the Retention Agreements is necessary to increase the retention of its employees, who are critical to achieving the Debtor's objections in Chapter 11. I further believe that if the retained employees leave the Debtor's employ, the Debtor's viability as a going concern will be severely compromised. The Debtor, by and through its management, has exercised its business judgment to determine that assumption of the Retention Agreements and implementation of the terms and conditions thereof as a Retention Program is in the best interests of its estate.

31. The Debtor's business is dependent upon its labor. I believe that absent payment of the Pre-petition Wages and honoring of the Employee Benefits, the Employees may cease working and seek employment elsewhere. In connection with the foregoing, I believe that any disruption to the Debtor's workforce would have a devastating effect upon the Debtor's business. In contrast, I believe that if the Debtor obtains the relief sought in the Payroll Motion, its business operations will continue in the ordinary course, customer needs will be met, and the Debtor will preserve and maximize the overall value of the Debtor's business enterprise for the benefit of its creditors. The Debtor does not propose to pay to any particular Employee, including insiders, Pre-petition Compensation in excess of the priority limit allowable under the Bankruptcy Code.

32. I believe that ample cause exists to permit the Debtor to pay the Pre-petition Compensation and honor the Employee Benefits. Specifically, it is my firm belief that continued operation of the Debtor's business is essential to its ability to maximize the value of its business:

The loss of any Employee at this critical juncture could materially damage the value of its overall business enterprise.

33. I further believe that it is critical that the Debtor continues, in the ordinary course, those personnel policies that were in effect prior to the Petition Date. If the direct deposits issued by Paycom in payment of any of the Pre-petition Compensation, if other employee obligations are dishonored, or if such obligations are not timely paid post-petition, I believe that the Employees may suffer extreme personal hardship and may be unable to pay their daily living expenses. If the Employees suffer personal hardship, Employee morale and goodwill could decline, undermining the Debtor's stability at this crucial juncture. I believe that, as a result, the Debtor, its value, its customers, and its ability to achieve its objectives in Chapter 11 could be devastated. Additionally, I believe that unless the Debtor can make to its employees the payments requested in the Payroll Motion, the disruption to the Debtor's employees and business practices would substantially jeopardize the Debtor's ability to reorganize its financial affairs.

34. I am informed and believe there on that all of the subject Pre-petition Compensation, as well as claims for vacation and sick leave benefits and other related benefits, constitute priority claims under the Bankruptcy Code, which will be paid by the Debtor's estate in any event. The Debtor is unable to determine whether the Employees earned all vacation, severance and sick leave pay within 180 days of the Petition Date or whether contributions to employee benefit plans arise from services rendered within 180 days of the Petition Date; however, the Debtor is not seeking to pay such claims – only authority to honor them. The Debtor does not seek to pay any payroll amounts in excess of the limit imposed by the Bankruptcy Code.

35. Pre-petition, the Debtor offered its general employees a Retention Bonus if they remained in the Debtor's employ for six (6) months after a CIC Transaction. The Debtor made such offer to incentivize its employees to remain with the Debtor and preserve its going concern value. Each current employee who is not an insider or an executive-level employee accepted the offer and executed a Retention Agreement. At this time, the Debtor, by and through its management, continues to believe that incentivizing its employees to remain in the Debtor's employ through a CIC Transaction is absolutely essential to meeting its goals in Chapter 11. In

this regard, I believe that assumption of the Retention Agreements, post-petition, and implementation of the employee Retention Program is in the best interests of the Debtor's estate and its creditors.

36. I believe that if the Court does not authorize the Debtor to assume the Retention Agreements the retained employees may leave the Debtor's employ. The Debtor's workforce is highly knowledgeable about the Debtor's technologies, and has long-standing relationships with its customers. The Debtor cannot quickly replace these employees or recreate the customer relationships that they have established over the years. On behalf of the Debtor, I believe that it must demonstrate its commitment to the retained employees and abide, post-petition, by the terms and conditions set forth therein as the Debtor's proposed Retention Program.

37. The Debtor has not offered a retention bonus to its three (3) executives or three (3) insiders. The retained employees are comprised only of the non-insider, non-executive employees that have remained with the Debtor notwithstanding pre-petition reductions in its workforce. I believe that the proposed Retention Program is reasonable under the circumstances.

38. The Debtor has an aggregate of approximately 800 creditors. I believe that requiring the Debtor to serve all of the creditors with notice of all proceedings in this case and to respond to the related inquiries arising therefrom would be administratively burdensome and unduly expensive. Accordingly, I believe that a Court order lessening the Debtor's notice requirements would substantially reduce the Debtor's postage and reproduction costs, as well as attorney's fees, from the outset of these bankruptcy proceedings, thereby facilitating significantly the economical and efficient administration of the Debtor's case.

39. I believe that limiting notice to the U.S. Trustee, the unsecured creditors holding the twenty (20) largest claims, or, if a committee of unsecured creditors is formed, to the committee or to any counsel employed by the committee; secured creditors and their counsel, and to all parties who request special notice in the Debtor's Chapter 11 case would provide adequate and proper notice to affected creditors and to other interested parties. Additionally, the Debtor will provide notice to any party whose interest is impacted directly by a particular action or proceeding that the Debtor files.

40. Notwithstanding the Debtor's proposed procedures for limiting notice in the Debtor's case, the Debtor will provide to all creditors notice of the following matters:

a. The time fixed for filing objections to, and the hearing to consider approval of, a disclosure statement;

b. The time fixed for filing objections to, and the hearing to consider confirmation of, a plan;

c. Any time fixed for filing objections to, and any hearing to consider, a proposed sale of all or substantially all assets of the estate;

d. Notices with respect to claims bar dates; and

e. Any time fixed for filing objections to, and any hearing on, a dismissal of the case.

41. I believe that adoption of this proposed notice procedure is necessary and appropriate, as the proposed procedure will relieve the Debtor of the significant administrative burdens that would be associated with periodic "mass mailings," and would reduce substantially the Debtor's postage and reproduction costs, as well as the time spent by attorneys and/or paralegals, thereby facilitating significantly the economical and efficient administration of the Debtor's case.

42. As of the filing of the Motions, no trustee, examiner or Committee has been appointed in the Debtor's Chapter 11 case. I have directed the Debtor's proposed general insolvency counsel to provide notice of the Cash Collateral Motion via e-mail or overnight mail to the U.S. Trustee, to the creditors asserting secured claims against the estate or to their counsel, and to the Debtor's twenty largest general unsecured, non-insider creditors.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 23rd day of June 2015, at Irvine, California.

Kenneth S. Cragun

# EXHIBIT "1"

| | 6/23-6/29<br>Week 1 | 6/30-7/6<br>Week 2 | 7/7-7/13<br>Week 3 | 7/14-7/20<br>Week 4 | 7/21-7/27<br>Week 5 | 7/28-8/3<br>Week 6 | 8/4-8-10<br>Week 7 | 8/11-8/17<br>Week 8 | 8/18-8/24<br>Week 9 | 8/25-8/31<br>Week 10 | 9/1-9/7<br>Week 11 | 9/8-9/14<br>Week 12 | 9/15-9/21<br>Week 13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **BEGINNING CASH** | 10,616 | 52,111 | 1,165,429 | 1,102,164 | 1,120,272 | 1,584,616 | 798,978 | 921,524 | 1,407,761 | 1,552,547 | 528,912 | 572,749 | 817,588 | 10,616 |
| **RECEIPTS** | | | | | | | | | | | | | | |
| Collections on Receivables | 95,038 | 1,428,318 | 382,371 | 41,404 | 580,944 | 124,223 | 182,546 | 931,860 | 163,086 | 1,883,143 | 128,437 | 1,027,500 | 128,793 | 7,097,663 |
| Financing | 250,000 | (250,000) | | | | | | | | | | | | - |
| **Total** | 345,038 | 1,178,318 | 382,371 | 41,404 | 580,944 | 124,223 | 182,546 | 931,860 | 163,086 | 1,883,143 | 128,437 | 1,027,500 | 128,793 | 7,097,663 |
| **DISBURSEMENTS** | | | | | | | | | | | | | | |
| **TAC** | | | | | | | | | | | | | | |
| Google | | | | | | 500,000 | | | | 2,300,000 | | | | 2,800,000 |
| Yahoo | | | | | - | | | 84,000 | | | | 372,000 | | 456,000 |
| **Rev Share** | | | | | - | | | 18,667 | | 10,000 | | 80,000 | | 108,667 |
| **Total TAC & Rev Share** | - | - | - | - | - | 500,000 | - | 102,667 | - | 2,310,000 | - | 452,000 | - | 3,364,667 |
| **Operations** | | | | | | | | | | | | | | |
| Labor and Payroll Taxes | 303,543 | - | 279,936 | - | | 279,936 | - | 279,936 | - | 279,936 | - | 279,936 | - | 1,703,221 |
| Labor and Payroll Taxes (Insiders) | - | - | 101,450 | - | - | 50,725 | - | 50,725 | - | 50,725 | - | 50,725 | - | 304,350 |
| Adv & Mktg | - | - | - | - | - | - | - | - | - | 32,250 | - | - | - | 32,250 |
| BOD Fees | - | - | 17,250 | 6,000 | 6,000 | - | 6,000 | - | 6,000 | - | 6,000 | - | 6,000 | 53,250 |
| Connectivity & Content | - | - | - | - | - | 1,000 | 24,000 | - | - | 92,667 | 1,000 | - | - | 118,667 |
| Consulting | - | 5,000 | 13,000 | 10,500 | - | 1,600 | 30,000 | 10,500 | - | 1,600 | 30,000 | - | 10,500 | 112,700 |
| Credit Card Fees | - | - | - | - | - | - | - | - | 7,000 | - | - | - | 7,000 | 14,000 |
| Insurance | - | - | - | 1,797 | - | - | - | 1,797 | - | - | - | - | 451,797 | 455,390 |
| Rent | - | - | 34,000 | - | - | 34,000 | - | - | - | - | 34,000 | - | - | 102,000 |
| Equipment Rental | - | - | - | - | - | 8,000 | - | - | - | 8,000 | - | - | - | 16,000 |
| Utilities | - | - | - | - | - | 7,600 | - | - | - | - | 7,600 | - | - | 15,200 |
| Telephone | - | - | - | - | 10,600 | - | - | - | - | 10,600 | - | - | - | 21,200 |
| Janitorial | - | - | - | - | - | 6,000 | - | - | - | - | 6,000 | - | - | 12,000 |
| Storage | - | - | - | - | - | - | - | - | 300 | - | - | - | - | 300 |
| Office Move | - | 60,000 | - | - | - | - | - | - | - | - | - | - | - | 60,000 |
| Travel | - | - | - | 5,000 | - | - | - | - | 5,000 | - | - | - | 5,000 | 15,000 |
| **Total Operational Disbursements** | 303,543 | 65,000 | 445,636 | 23,297 | 16,600 | 888,861 | 60,000 | 445,624 | 18,300 | 2,785,778 | 84,600 | 782,661 | 480,297 | 6,400,194 |
| **Chapter 11 Fees** | | | | | | | | | | | | | | |
| US Trustee Fees | | | | | | | | | | | | | - | - |
| Committee Professional Fees | | | | | 75,000 | 21,000 | | | | 96,000 | | | | 192,000 |
| Debtor's Professional Fees | | | | | 25,000 | | | | | 25,000 | | | | 50,000 |
| **Total Chpt 11 Fees** | - | - | - | - | 100,000 | 21,000 | - | - | - | 121,000 | - | - | - | 242,000 |
| **ENDING CASH** | 52,111 | 1,165,429 | 1,102,164 | 1,120,272 | 1,584,616 | 798,978 | 921,524 | 1,407,761 | 1,552,547 | 528,912 | 572,749 | 817,588 | 466,085 | 466,085 |
| **EQUITY CUSHION ANALYSIS** | | | | | | | | | | | | | | |
| **Summary of Cash Collateral** | | | | | | | | | | | | | | |
| Cash | - | 915,429 | 852,164 | 870,272 | 1,334,616 | 548,978 | 671,524 | 1,157,761 | 1,302,547 | 278,912 | 322,749 | 567,588 | 216,085 | |
| AR | 8,448,874 | 7,775,708 | 8,148,490 | 8,862,238 | 9,036,446 | 9,667,375 | 10,239,982 | 10,063,274 | 10,655,340 | 9,527,350 | 10,154,065 | 9,881,718 | 10,508,077 | |
| **Total Cash Collateral** | **8,448,874** | **8,691,137** | **9,000,654** | **9,732,510** | **10,371,062** | **10,216,354** | **10,911,506** | **11,221,035** | **11,957,887** | **9,806,262** | **10,476,814** | **10,449,306** | **10,724,162** | |
| **Loan Balance** | 2,308,000 | 2,308,000 | 2,308,000 | 2,308,000 | 2,308,000 | 2,308,000 | 2,308,000 | 2,308,000 | 2,308,000 | 2,308,000 | 2,308,000 | 2,308,000 | 2,308,000 | |
| **Equity Cushion** | 6,140,874 | 6,383,137 | 6,692,654 | 7,424,510 | 8,063,062 | 7,908,354 | 8,603,506 | 8,913,035 | 9,649,887 | 7,498,262 | 8,168,814 | 8,141,306 | 8,416,162 | |
| **Equity Cushion %** | **266%** | **277%** | **290%** | **322%** | **349%** | **343%** | **373%** | **386%** | **418%** | **325%** | **354%** | **353%** | **365%** | |

# EXHIBIT “2”

# RETENTION AGREEMENT

This RETENTION AGREEMENT (this "Agreement") is dated March __, 2015 by and between Local Corporation, a Delaware Corporation (the "Company") and __________________ ("Employee" and together with the Company, the "Parties").

WHEREAS, the Company has announced its intention to enter into a change in control transaction, whereby all or substantially all of the Company's stock and/or assets will be become owned by a third party (a "CIC Transaction");

WHEREAS, in order to induce Employee to continue to serve the Company in the position held by Employee through the closing of such CIC Transaction and a period of six (6) months thereafter, the Company desires to provide Employee with an opportunity to earn a retention bonus (the "Retention Bonus");

NOW, THEREFORE, in consideration of the foregoing premises and the terms and conditions set forth below, the Parties agree as follows:

**Section 1. Retention Bonus.** As inducement to Employee to continue employment with the Company through the date that is six (6) months after a CIC Transaction (the "Retention Date"), if Employee remains employed with the Company on the Retention Date, the Company shall pay Employee, in addition to annual salary and other bonus amounts payable to Employee, a Retention Bonus in the amount of 25% of Employee's then current annual salary, payable within seven (7) days after the Retention Date.

**Section 2. Severability.** The provisions of this Agreement are severable, and if any part of it is found to be unenforceable, the other Sections (or portions thereof) shall remain fully valid and enforceable.

**Section 3. Confidentiality.** The terms of this Agreement are intended to be confidential by the parties. Company would not enter into this Agreement but for Employee's promise to maintain the confidentiality of the terms of and existence of this Agreement. Employee may not disclose the terms of this Agreement to any person, except that Employee may disclose the terms of this agreement as may be required by law or to his/her immediate family, attorneys, tax and financial advisors, provided that such individuals agree to be bound by the confidentiality provisions of this Agreement.

**Section 4. Withholding.** All compensation or benefits payable to Employee pursuant to the terms of this Agreement shall be subject to deduction of all required federal and state withholding taxes and any other employment taxes the Company may be required to collect or withhold.

**Section 5. Choice of Law and Venue.** The Parties acknowledge and agree that this Agreement shall be interpreted in accordance with California law. To the extent any actions arising out of relating to this Agreement or Employee's Employment with Company must be filed in a court, rather than arbitration, such actions shall be filed in either the Superior Court of the State of

California for the County of Orange, or the Federal District Court for the Central District of California.

**Section 6. Deadline for Acceptance of this Offer.** In order to accept this Agreement, Employee must sign and return this Agreement to Company's Director of Human Resources no later than April 3, 2015. Any Agreement returned after April 3, 2015 shall be null and void.

**Section 7. At-Will Employment.** EMPLOYEE UNDERSTANDS, ACKNOWLEGES AND AGREES THAT EMPLOYEE'S EMPLOYMENT WITH THE COMPANY IS FOR AN UNSPECIFIED DURATION AND CONSTITUTES "AT-WILL" EMPLOYMENT. EMPLOYEE FURTHER UNDERSTANDS, ACKNOWLEDGES AND AGREES THAT ANY REPRESENTATION TO THE CONTRARY IS UNAUTHORIZED AND NOT VALID UNLESS OBTAINED IN WRITING AND SIGNED BY THE CHIEF EXECUTIVE OFFICER OF THE COMPANY. EMPLOYEE UNDERSTANDS, ACKNOWLEDGES AND AGREES THAT EMPLOYEE'S EMPLOYMENT RELATIONSHIP WITH THE COMPANY MAY BE TERMINATED AT ANY TIME, WITHOUT OR WITHOUT GOOD CAUSE OR ANY OR NO CAUSE, AT THE OPTION OF THE COMPANY OR EMPLOYEE, WITH OR WITHOUT NOTICE. NOTHING CONTAINED IN THIS AGREEMENT SHALL BE DEEMED A GUARANTEE OF EMPLOYMENT WITH THE COMPANY, PARENT OR ANY OF ITS AFFILIATES.

**Section 8. Effect of Termination.** If Employee's employment with the Company is terminated by Company for any reason other than fraud, misconduct or violation of the Company's policies prior to the Retention Date, Employee shall be entitled to receive the Retention Bonus within seven (7) days of such termination. For clarity, if Employee terminates his or her employment prior to the Retention Date, no Retention Bonus shall be payable.

**Section 9. Effect of Payments.** The payment of any Retention Bonus will not alter Employee's right to any other payment Employee is entitled to under any other plans, policies or arrangements of the Company, including without limitation Employee's annual salary or annual bonus payment eligibility.

IN WITNESS WHEREOF, the parties hereto have signed their names as of the day and year first above written to this Agreement.

Local Corporation,
a Delaware corporation

By:________________________________________,
Fred Thiel
Chief Executive Officer

EMPLOYEE

____________________________________________

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 660 Newport Center Drive, 4th Floor, Newport Beach, CA 92660.

A true and correct copy of the foregoing document entitled: **DECLARATION OF KENNETH S. CRAGUN IN SUPPORT OF DEBTOR'S EMERGENCY MOTIONS FOR ORDERS: (A) AUTHORIZING USE OF CASH COLLATERAL; (B) AUTHORIZING: (1) PAYMENT AND HONORING OF PRE-PETITION PAYROLL OBLIGATIONS; AND (2) APPROVING PROPOSED EMPLOYEE RETENTION PROGRAM FOR ESSENTIAL NON-INSIDER EMPLOYEES; AND (C) LIMITING NOTICE** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On June 23, 2015, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- United States Trustee (SA) ustpregion16.sa.ecf@usdoj.gov
- Marc J Winthrop mwinthrop@winthropcouchot.com, pj@winthropcouchot.com; vcorbin@winthropcouchot.com

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**: On _______________, 2015, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on June 23, 2015, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**Via Attorney Service - Bin outside of Room 5097**
Honorable Scott C. Clarkson
Ronald Reagan Federal Bldg.
411 W. Fourth St.
Santa Ana, CA 92701

VIA E-MAIL
Debtor: Ken Cragun, CFO – kcragun@local.com;
georgina.thomas@usbank.com; romar@google.com; matt@klickthru.com; brady@spacejetmedia.com; mail@allanliang.com; nicole.rogers@teamaol.com; li@engage-bdr.com; lance.r.thomas@aexp.com; vic@advertise.com; aly@airfind.com; Lahrens@lathropgage.com; abaxi@rocketfuelinc.com; sharonb@inner-active.com; brett@admarketplace.com; kia@matchflowmedia.com; peter@bidmonitor.com; dandrin@forensiq.com; newportbeach@rrdfsg.com; rayan@phoenixadmedia.com; nancy.goldenberg@usdoj.gov; ustpregion16.sa.ecf@usdoj.gov

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| June 23, 2015 | Viann Corbin | */s/ Viann Corbin* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |