MARC J. WINTHROP – State Bar No. 63218
mwinthrop@winthropcouchot.com
JEANNIE KIM – State Bar No. 270713
jkim@winthropcouchot.com
**WINTHROP COUCHOT**
**PROFESSIONAL CORPORATION**
660 Newport Center Drive, Suite 400
Newport Beach, CA 92660
Telephone:    (949) 720-4100
Facsimile:     (949) 720-4111

[Proposed] General Insolvency Counsel
for Debtor and Debtor-in-Possession

### UNITED STATES BANKRUPTCY COURT

### CENTRAL DISTRICT OF CALIFORNIA

### SANTA ANA DIVISION

| | |
|---|---|
| In re: | Case No. 8:15-bk-13153 SC |
| LOCAL CORPORATION, a Delaware corporation, | Chapter 11 Proceeding |
| Debtor and Debtor-in-Possession. | **APPLICATION OF DEBTOR AND DEBTOR-IN-POSSESSION FOR AUTHORITY TO EMPLOY SIEMER & ASSOCIATES AS ITS INVESTMENT BANKING FIRM; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF DAVID SIEMER IN SUPPORT THEREOF**<br><br>[11 U.S.C. §§ 327 and 330]<br><br>[No Hearing Requested] |

1    **TO THE HONORABLE SCOTT C. CLARKSON, UNITED STATES**

2    **BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, AND**

3    **OTHER PARTIES-IN-INTEREST:**

4        Local Corporation, a Delaware corporation and the debtor and debtor-in-possession in the

5    above Chapter 11 proceeding (the "Debtor"), hereby applies (the "Application") to this Court for

6    an order authorizing it to employ Siemer & Associates (the "Firm") as its general insolvency

7    counsel.  This Application is made and based upon the memorandum of points and authorities and

8    the Declaration of David Siemer (the "Declaration") appended hereto, and upon any additional

9    evidence, both oral and documentary, that may be presented to the Court at or before the time of

10    the hearing on this Application, should any be held.

11    **I.**

12    **STATEMENT OF FACTS**

13    **A.**    **The Debtor.**

14        On June 23, 2015 (the "Petition Date"), the Debtor filed a voluntary petition for relief

15    under Chapter 11 of the Bankruptcy Code due to a temporary and incidental liquidity problem that

16    could not be bridged within the time available through third party financing.  Under Sections 1107

17    and 1108 of the Bankruptcy Code, the Debtor operates its business and manages its financial

18    affairs as a debtor-in-possession.  The Debtor has determined that in Chapter 11, it will be able to

19    maximize value through the sale of its business as a going concern.

20        Founded in 1999, the Debtor is in the business of providing search results to consumers

21    who are searching online for local businesses, products and services.  The search results generated

22    by the Debtor's technology platform consist primarily of local business listings that the Debtor's

23    technology aggregates, indexes, normalizes, and syndicates.  These search results are provided

24    through the Debtor's flagship Local.com website and through other proprietary websites, and they

25    are also delivered to a network of over 1,600 other websites that rely on the Debtor's search

26    syndication services to provide local search results to their own users ("Network").  The Debtor

27    generates revenue from these services through the various ad units that are placed alongside

28    search results, which include pay-per-click, pay-per-call, and display (banner) ad units, including

video.  The Debtor's Local.com website has approximately 14 million unique visitors each month ("MUVs"), and its Network syndication services reach approximately 5 million MUVs.

In 2004, the Debtor became a publicly held company.  For a number of years, the Debtor has been one of the fastest growing online local media businesses, and, for the past four years, it has been recognized by Deloitte on its Technology Fast 500 list.

The Debtor's expertise in the areas of local search, search engine marketing, search engine optimization, search syndication/analysis and reporting at large scale, internet indexing and normalizing has enabled the company to develop and deploy new technologies and products.  As of this writing, the Debtor holds thirteen patents, and a number of additional patent applications are pending.  These technologies have enabled the Company to achieve great success in growing the number of consumers that its media reaches.  Recent trends and forecasts for the local advertising marketplace estimate that the domestic local search market in the U.S. will grow to $8.6 billion by 2017.  The Debtor's existing technology platforms and the new products that it is in the process of deploying ideally position the Company to take advantage of this growth trend.

**B.    Sale of Assets and Need for the Firm's Employment.**

The Debtor has determined that it requires the Firm to provide business and asset transaction advisory and related consulting services in order to preserve and maximize the Debtor's enterprise value.  Specifically, the Debtor requires the Firm to advise the Debtor regarding the sale of substantially all of the Debtor's assets (the "Assets") as a going concern.  Based on the foregoing, the Debtor requires the Firm to serve as its investment banking firm in this case and seeks to employ the Firm, effective as of the Petition Date, in accordance with the terms of the engagement Agreement (the "Engagement Agreement") entered into between them.  A true and correct copy of the Engagement Agreement is attached to the Declaration as Exhibit "1" and incorporated herein by this reference.

**C.    The Firm's Qualifications and Services to Be Rendered.**

The Firm is a boutique merchant bank that works with technology, software and digital media companies throughout their complete life cycle and is well qualified to represent the Debtor in this case.  A copy of the Firm's resume is attached to the Declaration as Exhibit "2" and

1   incorporated herein by this reference.  The Firm anticipates that Daniel Chen, Managing Director,

2   will be the professional primarily responsible for the services rendered to the Debtor.

3        The scope of services the Firm may provide is limited to transaction advisory services,

4   intellectual property monetization services, if appropriate, and related consulting services in

5   connection with the sale of the Debtor's Assets.  Specifically, the services the Firm may perform

6   may include:

7        (1)    Familiarizing itself with the Debtor and its Assets;

8        (2)    Assisting the Debtor with the preparation of materials to be used to

9   describe the Debtor and its Assets for the purposes of a Transaction;

10       (3)    Advising and assisting the Debtor in identifying Targets;

11       (4)    Assisting the Debtor in making presentations to Targets;

12       (5)    Assisting the Debtor in the selection of a stalking horse bidder and

13  negotiating with the proposed stalking horse bidder; and

14       (6)    Assisting the Debtor in structuring and negotiating a Transaction.

15       **D.    <u>Terms of the Proposed Employment</u>.**

16       The Firm will render services to the Debtor in accordance with the compensation

17  arrangement described in the Engagement Agreement and summarized herein, except, however,

18  that paragraph 12 of the Engagement Agreement regarding arbitration of any controversy or claim

19  arising out of or relating to the proposed engagement shall not apply.  Instead, the Debtor and the

20  Firm have agreed that the Bankruptcy Court shall have and retain jurisdiction over any and all

21  controversies or claims, if any, arising out of or relating to the Debtor's proposed engagement of

22  the Firm.

23       As further set forth in the Declaration and Engagement Agreement, the Firm has waived a

24  cash retainer.  At the closing of a Transaction during the Term (six (6) months from the time of

25  engagement) or Tail with any Target, the Debtor shall pay to the Firm a Sale Fee in an amount

26  equal to the greater of:  (1) 3.5% of the Aggregated Consideration up to and including

27  $35,000,000, plus 5% of the Aggregate Consideration greater than $35,000,000; or (2) a

28  Minimum Sale Fee of $850,000.  In the event that a proposed Transaction terminates or is

1    abandoned during the Term of within the 12 months thereafter, and the Debtor receives any

2    "Breakup Fee," "Termination," "Topping" or similar fee, payment or profit arising from any

3    shares (or option to acquire shares or assets) of any prospective purchaser or any of its affiliates

4    acquired in connection with the proposed Transaction, the Debtor shall pay to the Firm a Breakup

5    Fee equal to 20% of all such fees or profits, net of direct, out-of-pocket expenses incurred by the

6    Debtor in connection with the proposed Transaction ("Siemer Breakup Fee"), which Siemer

7    Breakup Fee will credited toward any Sale Fee or Minimum Sale Fee.  As set forth herein and in

8    the Declaration, the Debtor believes that the Minimum Sale Fee is reasonable under the

9    circumstances given the nature and size of the Debtor's enterprise, i.e., the Debtor is a digital

10   advertising company with revenues of $83.0 million in 2014, and the fact that the Debtor is a

11   publicly traded company.

12       Separate and apart from the Sale Fee, the Debtor has agreed to reimburse the Firm for all

13   of its reasonable out-of-pocket expenses in connection with the performance of its services under

14   the terms of the Engagement Agreement, regardless of whether a Transaction occurs ("Expense

15   Reimbursement").  The amount of any such Expense Agreement shall not be greater than $20,000

16   per month or $100,000 in the aggregate without the Debtor's prior written approval.  The Firm

17   understands that each and all of the terms of the Engagement Agreement are subject to this

18   Court's approval.

19       The services to be provided by the Firm will not be unnecessarily duplicative of those

20   services provided by any of the Debtor's other professionals.  The Firm also has agreed and

21   represented to the Debtor that the Firm will coordinate any services performed at the Debtor's

22   request with the Debtor's other professionals, including the Debtor's corporate officers and

23   general insolvency counsel, as appropriate and necessary to avoid duplication.

24       The Firm intends to apply to this Court for compensation in conformity with the

25   requirements of Sections 327 and 330 of the Bankruptcy Code.  The Firm understands that any

26   compensation in this case to be paid from funds that are property of the Debtor's estate is subject

27   to approval of this Court.  No funds paid to the Firm pursuant to the terms of the Engagement

28

MAINDOCS-#212690-v1-Local_AppEmploySiemerAssociatesInvestmentBank.doc

1  Agreement will be deemed to be allowed by the Court.  All funds paid to the Firm will be subject

2  to allowance by the Court, upon appropriate application and noticed hearing.

3       **E.       Disclosure of Relationship with the Firm.**

4       As set forth in the Declaration, the Firm has conducted a conflicts check on the Debtor's

5  creditors.  Based on the results of the conflicts search conducted to date, the Firm believes that the

6  Firm does not, insofar as the Firm has been able to ascertain:  (1) hold or represent any interest

7  adverse to the Debtor or this Chapter 11 case that would impair the Firm's ability to objectively

8  perform professional services for the Debtor, in accordance with Section 327 of the Bankruptcy

9  Code; or (2) have any connection with creditors and other parties-in-interest relating to the Debtor

10 or this Chapter 11 case.

11      To the best of the Firm's knowledge, neither the Firm nor any of its professionals:  (1) is a

12 creditor, an equity security holder, or an insider of the Debtor as of the Petition Date; (2) is or was,

13 within two (2) years before the Petition Date, a director, officer or employee of the Debtor; or (3)

14 has an interest materially adverse to the interest of the estate or of any class of creditors or equity

15 security holders, by reason of any direct or indirect relationship to, connection with or interest in

16 the Debtor or for any other reason.

17      None of the professionals comprising or employed by the Firm is related to any judge of

18 the United States Bankruptcy Court for the Central District of California, the United States

19 Trustee (the "UST"), or to any person employed by the UST.  The Firm has not agreed to share

20 with any person or entity any compensation received by the Firm in this case, except as among

21 the members of the Firm.

## II.

### THE BANKRUPTCY CODE AUTHORIZES THE

### DEBTOR TO EMPLOY PROFESSIONALS

25      Section 327 of the Bankruptcy Code, which governs employment of professional persons,

26 provides, in pertinent part, as follows:

27

28

1

2

3

> . . . the trustee[1], with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

4   11 U.S.C. § 327(a).

5       Rule 2014 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") mandates

6   that a professional seeking approval of its employment by the bankruptcy estate disclose "any

7   proposed arrangement for compensation" and "all of the person's connections with the debtor,

8   creditors, any other party in interest, its respective attorneys and accountants, [and] the United

9   States Trustee." Fed. R. Bankr. P. 2014. All facts pertinent to a court's determination of whether

10  the professional is disinterested or holds an interest adverse to the estate must be disclosed. The

11  professional is required to make a full, candid and complete disclosure in its application for

12  employment. *See In re Lotus Prop. LP*, 200 B.R. 388, 391 (Bankr. C.D. Cal. 1996) (citing *In re*

13  *Park Helena Corp.*, 63 F.3d 877, 880-82 (9th Cir. 1995)); *In re Gire*, 107 B.R. 739, 746 (Bankr.

14  E.D. Cal. 1989); Fed. R. Bankr. P. 2014.

15      **A.       The Firm Does Not Hold an Interest Adverse to the Estate.**

16      The phrase "adverse interest" is not statutorily defined. However, courts have stated that a

17  party will be deemed to hold or represent an "adverse interest" to the estate when it: (1) possesses

18  or asserts any economic interest that would tend to lessen the value of the bankruptcy estate or that

19  would create an actual or potential dispute in which the estate is a rival claimant; or (2) possesses a

20  predisposition under circumstances that render such a bias against the estate. *Tevis v. Wilke,*

21  *Fleury, Hoffelt, Gould & Birney (In re Tevis)*, 347 B.R. 647, 688 (B.A.P. 9th Cir. 2006); *In re Lee*,

22  94 B.R. 172, 177 (Bankr. C.D. Cal. 1989). Here, neither the Firm nor any professionals who are

23  members of the Firm possess or assert an economic interest that would tend to lessen the value of

24  the estate or that would create an actual or potential dispute against the estate or has a

25  predisposition that will create a bias against the estate. Accordingly, the Firm does not hold an

26  interest adverse to the estate.

27

28

---

[1] Except for certain limitations not applicable here, a debtor has all of the rights and powers of, and performs all of the functions and duties of, a trustee in a chapter 11 case. 11 U.S.C. § 1107(a).

**B.**     **The Firm is Disinterested.**

"Disinterested persons" are defined in Section 101(14) as follows:

"disinterested person" means [a] person that -
    (A) is not a creditor, an equity security holder, or an insider;
    (B) is not and was not, within 2 years before the date of the filing of the
petition, a director, officer, or employee of the debtor; and
    (C) does not have an interest materially adverse to the interest of the estate
or of any class of creditors or equity security holders, by reason of any direct
or indirect relationship to, connection with, or interest in, the Debtor . . . or for
any other reason . . .

11 U.S.C. § 101(14).

Based on the disclosure made herein, the Firm is disinterested.

**C.**     **The Firm's Employment Should Be Approved.**

Based on the foregoing and the disclosure made herein, which satisfies the disclosure

requirements imposed by the Bankruptcy Code, Bankruptcy Rules 2014 and Rule 2014-1 of the

Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of

California ("LBR"), the Firm has met the required standards for employment in this case.

Accordingly, this Court may authorize the proposed employment of the Firm as general

insolvency counsel to the Debtor pursuant to Section 327(a) of the Bankruptcy Code.

**III**.

**NOTICE OF THE APPLICATION IS APPROPRIATE, AND NO**

**FURTHER HEARING WITH RESPECT TO THE APPLICATION IS**

**REQUIRED, UNLESS SUCH HEARING IS ORDERED BY THIS**

**COURT OR SPECIFICALLY REQUESTED BY A PARTY-IN-INTEREST**

Notice of the relief requested by this Application has been provided to the UST and any

other party in interest entitled to notice under Bankruptcy Rule 2002 and LBR 2014-1(b)(2)(A).

The UST has been afforded an opportunity to object to the Application and request a hearing on

this Application, should the UST object to the relief requested hereby.  Upon appointment of a

committee and its retention of counsel, if any, the Firm will provide notice of the relief requested

herein and afford the Committee an opposition to object to the Application and request a hearing

### IV.

### CONCLUSION

Based upon the foregoing, the Debtor respectfully submits that good cause exists for this

Court to enter an order:

      1.    Authorizing the Debtor, based upon the foregoing and pursuant to

Sections 327(a) and 330 of the Bankruptcy Code, Bankruptcy Rule 2014(a), and

LBR 2014-1 to employ the Firm as its exclusive investment banking firm, effective as of

the Petition Date, with compensation of the Firm to be in accordance with the terms set

forth herein and in the Engagement Agreement;

      2.    Authorizing the Debtor to pay to the Firm pay to the Firm:

           a.    The Sale Fee, or, at a minimum, the Minimum Sale Fee; and

           b.    The Expense Reimbursement; and

      3.    Granting to the Firm such other and further relief as the Court deems just

and appropriate.

DATED:  July  7 , 2015

**LOCAL CORPORATION,**
**a Delaware corporation**

By:_____
          Kenneth S. Cragun
          Chief Financial Officer

**PRESENTED BY:**

**WINTHROP COUCHOT**
**PROFESSIONAL CORPORATION**

By:/s/ Jeannie Kim_____
      Marc J. Winthrop
      Garrick A. Hollander
      Jeannie Kim
[Proposed] General Insolvency Counsel
for Debtor and Debtor-in-Possession

1

## DECLARATION OF DAVID SIEMER

2      I, David Siemer, declare and state as follows:

3      1.      I am the founding Managing Director of Siemer & Associates, LLC (the "Firm").[2]

4 I have reviewed the *Application of Debtor and Debtor-in-Possession for Authority to Employ*

5 *Siemer & Associates as Its Investment Banking Firm* (the "Application") filed by Local

6 Corporation, the debtor and debtor-in-possession in the above entitled case (the "Debtor"), and am

7 authorized to and make this declaration on behalf of the Firm and submit this declaration in

8 support of the Application.  I have personal knowledge of the facts stated herein, and if called

9 upon as a witness, I could and would testify competently thereto.

10      2.      I am informed and believe thereon that the Debtor has determined that it requires

11 the Firm to provide business and asset transaction advisory and related consulting services in order

12 to preserve and maximize the Debtor's enterprise value.  Additionally, the Debtor requires the

13 Firm to advise the Debtor regarding the sale of substantially all of the Debtor's assets (the

14 "Assets") as a going concern.  Based on the foregoing, the Firm has agreed to serve as the

15 Debtor's investment banking firm in this case.  The Firm therefore seeks Court authorization to be

16 employed by the Debtor, effective as of June 23, 2015, in accordance with the terms of the

17 engagement agreement (the "Engagement Agreement") entered into between the Debtor and the

18 Firm.  A true and correct copy of the Engagement Agreement is attached hereto as Exhibit "1" and

19 incorporated herein by this reference.

20      3.      The Firm is a boutique merchant bank that works with technology, software and

21 digital media companies throughout their complete life cycle and is well qualified to represent the

22 Debtor in this case.  A copy of the Firm's resume is attached hereto as Exhibit "2" and

23 incorporated herein by this reference.  I anticipate that Daniel Chen, Managing Director, will be

24 the professional overseeing the services rendered to the Debtor.

25      4.      The scope of services the Firm may provide is limited to transaction advisory

26 services, intellectual property monetization services, if appropriate, and related consulting services

27

28

---

[2] Capitalized terms not defined herein shall have the meaning set forth in the Application or in the Retainer Agreement.

1    in connection with the sale of the Debtor's Assets.  Specifically, the services the Firm may

2    perform may include:

3            a.     Familiarizing itself with the Debtor and its Assets;

4            b.     Assisting the Debtor with the preparation of materials to be used to

5    describe the Debtor and its Assets for the purposes of a Transaction;

6            c.     Advising and assisting the Debtor in identifying Targets;

7            d.     Assisting the Debtor in making presentations to Targets;

8            e.     Assisting the Debtor in the selection of a stalking horse bidder and

9    negotiating with the proposed stalking horse bidder; and

10            f.     Assisting the Debtor in structuring and negotiating a Transaction.

11         5.     The Firm will render services to the Debtor in accordance with the compensation

12    arrangement described in the Engagement Agreement and summarized in the Application, except,

13    however, that the Firm and the Debtor have agreed that paragraph 12 of the Engagement

14    Agreement regarding arbitration of any controversy or claim arising out of or relating to the

15    proposed engagement shall not apply.  Instead, the Firm has agreed with the Debtor that the

16    Bankruptcy Court shall have and retain jurisdiction over any and all controversies or claims, if

17    any, arising out of or relating to the Debtor's proposed engagement of the Firm.

18         6.     The Firm has waived a cash retainer.  At the closing of a Transaction during the

19    Term (six (6) months from the time of engagement) or Tail with any Target, the Debtor has agreed

20    to pay to the Firm a Sale Fee in an amount equal to the greater of:  (1) 3.5% of the Aggregated

21    Consideration up to and including $35,000,000, plus 5% of the Aggregate Consideration greater

22    than $35,000,000; or (2) a Minimum Sale Fee of $850,000.  In the event that a proposed

23    Transaction terminates or is abandoned during the Term of within the 12 months thereafter, and

24    the Debtor receives any "Breakup Fee," "Termination," "Topping" or similar fee, payment or

25    profit arising from any shares (or option to acquire shares or assets) of any prospective purchaser

26    or any of its affiliates acquired in connection with the proposed Transaction, the Debtor has agreed

27    to pay to the Firm a Breakup Fee equal to 20% of all such fees or profits, net of direct, out-of-

28    pocket expenses incurred by the Debtor in connection with the proposed Transaction ("Siemer

Breakup Fee"), which Siemer Breakup Fee will credited toward any Sale Fee or Minimum Sale Fee.

7.    As set forth in the Application, the Minimum Sale Fee is reasonable under the circumstances.  The Debtor is a publicly traded digital advertising company with revenues of $83.0 million in 2014.  Typically, investment banking firms advising companies like the Debtor in their efforts to close a Transaction require a minimum fee of $1,000,000.  Here, the Firm has made significant accommodations for the Debtor based upon its cash flow concerns and need to pursue and. if possible, consummate a Transaction with a Target in a relatively short period of time.  In fact, the Firm not only reduced the typical minimum fee that is standard in this industry, but waived the cash retainer fee that the Firm usually requires.  In light of the foregoing, I firmly believe and submit that the Minimum Sale Fee that the Debtor and the Firm agreed upon is reasonable.  Furthermore, I believe that the Minimum Sale Fee is less than the amount other investment banking firms would likely require to advise a company of this size and nature in the going concern sale of its business.

8.    Separate and apart from the Sale Fee, the Debtor has agreed to reimburse the Firm for all of its reasonable out-of-pocket expenses in connection with the performance of its services under the terms of the Engagement Agreement, regardless of whether a Transaction occurs ("Expense Reimbursement").  The amount of any such Expense Agreement shall not be greater than $20,000 per month or $100,000 in the aggregate without the Debtor's prior written approval. The Firm understands that each and all of the terms of the Engagement Agreement are subject to this Court's approval.

9.    The services to be provided by the Firm will not be unnecessarily duplicative of those services provided by any of the Debtor's other professionals.  The Firm also has agreed and represented to the Debtor that the Firm will coordinate any services performed at the Debtor's request with the Debtor's other professionals, including the Debtor's corporate officers and general insolvency counsel, as appropriate and necessary to avoid duplication.

10.    The Firm intends to apply to this Court for compensation in conformity with the requirements of Sections 327 and 330 of the Bankruptcy Code.  I understand that any

1    compensation in this case to be paid from funds that are property of the Debtor's estate is subject

2    to approval of this Court.  I further understand that no funds paid to the Firm pursuant to the terms

3    of the Engagement Agreement will be deemed to be allowed by the Court, but that all funds paid

4    to the Firm will be subject to allowance by the Court, upon appropriate application and noticed

5    hearing.

6        11.    The Firm has conducted a conflicts check on the Debtor's creditors.  Based on the

7    results of the conflicts search conducted to date, to the best of my knowledge, I believe that the

8    Firm does not, insofar as the Firm has been able to ascertain:  (1) hold or represent any interest

9    adverse to the Debtor or this Chapter 11 case that would impair the Firm's ability to objectively

10    perform professional services for the Debtor; or (2) have any connection with creditors and other

11    parties-in-interest relating to the Debtor or this Chapter 11 case.

12        12.    To the best of my knowledge, neither the Firm nor any of its professionals:  (1) is a

13    creditor, an equity security holder, or an insider of the Debtor as of the Petition Date; (2) is or was,

14    within two (2) years before the Petition Date, a director, officer or employee of the Debtor; or (3)

15    has an interest materially adverse to the interest of the estate or of any class of creditors or equity

16    security holders, by reason of any direct or indirect relationship to, connection with or interest in

17    the Debtor or for any other reason.

18        13.    To the best of my knowledge, none of the professionals comprising or employed by

19    the Firm is related to any judge of the United States Bankruptcy Court for the Central District of

20    California, the United States Trustee (the "UST"), or to any person employed by the UST.  The

21    Firm has not agreed to share with any person or entity any compensation received by the Firm in

22    this case, except as among the members of the Firm.

23    / / /

24    / / /

25    / / /

26    / / /

27    / / /

28    / / /

MAINDOCS-#212690-v1-Local_AppEmploySiemerAssociatesInvestmentBank.doc

1    14.    To the best of my knowledge, neither the Firm nor any professionals who are

2  members of the Firm possess or assert an economic interest that would tend to lessen the value of

3  the estate or that would create an actual or potential dispute against the estate or has a

4  predisposition that will create a bias against the estate.

5    I declare under penalty of perjury that the foregoing is true and correct.

6    Executed on this 7th day of July 2015 at Santa Monica, California.

7

8    _____

9

10    David Siemer

# EXHIBIT "1"



## ENGAGEMENT AGREEMENT

This Engagement Agreement ("Agreement") is made and entered into as of April 10, 2015 (the "Effective Date") by and between Siemer & Associates, LLC ("Siemer") and Local Corporation ("Client" or "Company").

### WITNESSETH:

WHEREAS, Siemer provides, among other services, investment banking services; and

WHEREAS, Client desires to engage Siemer to act as its exclusive financial advisor.

NOW, THEREFORE, the parties agree as follows:

1.    **ENGAGEMENT.** Client hereby engages Siemer to advise and assist Client during the Term (as defined below) in connection with the proposed sale, transfer, conveyance, exchange, trade or other disposition of 50.0% or more of the outstanding legal or beneficial ownership of Company, including a parent company or any subsidiaries (the "Property") on a best-efforts basis on terms satisfactory to Client, whether accomplished by a sale or exchange of assets or securities, by merger or by any other means (a "Transaction") from selected potential acquirers (collectively, "Targets"). During the Term, Client shall not initiate or otherwise promote a Transaction with any other investment banking firm or other person other than Siemer. Notwithstanding the foregoing, the Company will not be prohibited from hiring a consultant to market for sale its Krillion assets and patent portfolio, separately or in concert with Siemer. Notwithstanding the exclusive nature of this relationship, the parties acknowledge and agree that the Company or the Board or the Special Committee of the Board may at any time retain one or more financial advisors solely in connection with such financial advisors providing a fairness opinion concerning a Transaction to the Company or the Board or the Special Committee of the Board.

2.    **DUTIES OF SIEMER.** Siemer's services hereunder shall include, without additional consideration or fees except as expressly set forth herein: (A) familiarizing itself with Client and the Property, it being understood that Siemer shall rely entirely upon information supplied by Client without independent investigation; (B) assisting Client in preparation of materials to be used to describe Client and the Property for purposes of a Transaction (collectively, the "Materials"); (C) advising and assisting Client in identifying Targets (and, on behalf of Client, contacting such Targets as Client may designate, and furnishing them, on behalf of Client, with copies of the Materials); (D) assisting Client in making presentations to Targets; and (E) assisting Client in structuring and negotiating a Transaction. In performing its duties hereunder, Client and Siemer each agree that Siemer shall not be an agent or fiduciary of Client and may not bind or obligate Client in any way. Client further agrees that Siemer is being engaged hereunder to provide the services described above solely to Client, and Siemer shall have no duty or liability to any other person in connection with this Agreement.

3.    **TERM.** The term of this Agreement (the "Term") will be for a period of at least 6 months beginning on the Effective Date and continue until the earlier of (A) closing a Transaction, or (B) receipt of written notice of termination from Client. The Client may terminate this agreement at any time provided that such termination is done after the Term and Siemer receives such notice in writing. This action initiates the Tail ("Tail") lasting a period of 12 months for all the Transaction Targets that Siemer reaches out to during the Transaction process.

4.    **COMPENSATION.** As reasonable compensation for the services to be provided by Siemer hereunder, Client shall pay to Siemer the following fees:

A.    **Cash Retainer:** Waived.

B.    **Sale Fee:**

i.    At the closing of a Transaction, Client shall pay Siemer a fee (the "Sale Fee") in an amount equal to the greater of (A) 3.5% of the Aggregate Consideration (as defined below) up to and including $35,000,000, plus 5% of the Aggregate Consideration (as defined below) greater than $35,000,000; or (B) a minimum sale fee ("Minimum Sale Fee") of $850,000. The Sale Fee shall be payable if Client consummates a Transaction during the Term or Tail with any Targets. A Transaction shall be deemed to have been consummated if: (A) any person or entity acquires at least 50.0% of the outstanding voting securities (or securities convertible into voting securities), on a fully-diluted basis, of Client; (B) Client merges with another

1 of 9



person or entity; or (C) any person or entity acquires assets representing 50.0% or more of Client's book value or 50.0% or more of the revenue producing assets.

ii.     The Sale Fee shall be paid by wire transfer to Siemer's bank account at the closing of any Transaction. Client shall, or shall cause Targets, to provide Siemer with prior notice of any payment or receipt of Aggregate Consideration together with a copy of a reasonable calculation or valuation that support a determination of the Aggregate Consideration. Notwithstanding the foregoing, any amounts to be paid to Client or its equity holders which are contingent upon future events or otherwise payable to Client or its equity holders after closing, as a result of earn-outs, promissory notes, or otherwise ("Contingent Consideration"), the Sale Fee related to such payments (if any) shall be paid if and when such payments are actually paid to Client or its equity holders. Regardless of any Contingent Consideration, Siemer shall be paid the Minimum Sale Fee at the closing of any Transaction.

iii.    "Aggregate Consideration" as it relates to a Transaction means, without duplication, the sum of the aggregate (A) amount of consideration paid by the acquirer (whether to Client or the equity and debt holders of Client), (B) amount of consideration received by the equity holders of Client (which shall include amounts paid or to be paid into escrow and to option holders, warrant holders or any other derivative security, in each case, whether vested or unvested) or the Client, (C) implied value of any equity interest retained by the equity holders of Client or the Client, (D) (intentionally omitted), (E) amount of any debt assumed or repaid by the purchaser or preferred stock redeemed or remaining outstanding in the Client, and (F) amounts paid or payable under employment or consulting agreements, including the value of stock options (or similar instruments, e.g. phantom units), restricted stock or units granted, deferred payments, covenants not to compete and covenants not to solicit, payments to management or traded/exchanged properties, provided that the value of any out-of-the money options, warrants, or other convertible securities shall not be included in the calculation of the Aggregate Consideration. In regards to a Transaction involving public stock, the value consideration of the stock will be based upon the methodology for such valuation set forth in the definitive Transaction documents, or, if no such methodology is established, then the a VWAP (Volume Weighted Average Pricing) which will be based upon the previous 10 trading days prior to the announcement of a Sale. Except as set forth in clause (vi) below, if all or any portion of the Aggregate Consideration is paid in the form of assets other than cash, the value of such non-cash consideration shall be based on the methodology for such valuation set forth in the definitive Transaction documents, or, if no such methodology is established, then the fair market value thereof. The parties shall use commercially reasonable efforts to mutually agree on the fair market value of any such non-cash consideration prior to the time the Sale Fee or any portion thereof is payable. Client shall notify Siemer in advance of any closing of a Transaction and Siemer shall have the right to attend any such closing. Client shall provide Siemer with access to all closing documents reasonably necessary for Siemer to ascertain and timely collect its fees hereunder.

iv.     If all or any portion of the Aggregate Consideration relates to indemnity holdbacks or any other guaranteed payments held in escrow, the portion of the Sale Fee relating thereto shall be calculated and paid at the time the Transaction is consummated.

v.      If the Sale Fee is greater than $850,000 then the Client is responsible to pay Siemer $850,000 in cash, and the remaining balance of the Sale Fee can be paid pro-rata to any structure and/or stock given to the Client in the Sale.

vi.     If any portion of the Aggregate Consideration is a contingency payment relating to future earnings or operations and is payable to any person or entity after the closing of the Transaction ("Contingency Consideration"), the portion of the Sale Fee attributable to such Contingency Consideration shall be paid to Siemer at the same time such Contingency Consideration is paid to such person or entity (it being understood that in the event the original Sale Fee is measured based upon Section 4(b), then any additional Sale Fee resulting from the payment in cash of such Contingency Consideration shall only become payable if, and then only to the extent, such additional Contingency Consideration would cause an incremental amount in excess of the Minimum Sale Fee to become payable). Regardless of any Contingency Consideration or holdbacks, Siemer shall be paid a Minimum Sale Fee at the closing of any Transaction.

vii.    Transaction Breakup Fee ("Breakup Fee"): If in connection with the termination or abandonment of a proposed Transaction during the term of this agreement or within 12 months thereafter, the Client receives any so-called Breakup Fee, also known as a "Termination," "Topping," or similar fee or payment (including any characterized as expense reimbursement and any judgment for damages or amount in settlement of any dispute as a result of any termination or other failure to consummate the Transaction) or any profit arising from any shares (or option to acquire shares or assets) of any prospective purchaser or any of its affiliates acquired in connection with the Transaction, a Breakup Fee equal to 20% of all such

2 of 9



fees or profits, net of direct out-of-pocket expenses incurred by the Client in connection with the proposed Transaction excluding this breakup fee, will be payable in cash to Siemer promptly upon receipt of any such compensation by the Company. Any related fees collected by Siemer in regards to a Breakup Fee, will be credited towards any Sale Fee or Minimum Sale Fee.

5.      EXPENSE REIMBURSEMENT. Regardless of whether any Transaction is proposed or consummated, Client shall reimburse Siemer within ten business days of receipt of invoices from Siemer, for all reasonable out-of-pocket expenses incurred by Siemer in connection with this Agreement, including but not limited to expenses related to legal fees, communications, printing, copying, delivery, meals and travel. Siemer shall obtain prior written approval for any expense over $2,000 and shall not incur expenses greater than $20,000 per month or $100,000 in the aggregate, without Company's prior written approval.

6.      COOPERATION. Client shall furnish Siemer with all financial and other information and data as Siemer reasonably believes appropriate and necessary in order to fulfill its obligations under this Agreement, and shall provide Siemer access to the officers, directors, employees and professional advisors of Client. During the Term, Client agrees to provide to Siemer the names of potential Targets that are, or become, known to Client. Client acknowledges and agrees that Siemer: (A) shall be entitled to rely without investigation upon all information that is available from public sources or supplied to it by Client or any advisor of Client; (B) shall not be responsible for, and need not verify, the accuracy, completeness or sufficiency of the information described in clause (A) above; and (C) shall be entitled to assume that all projections made available to Siemer and prepared by the Company will have been prepared in good faith based upon reasonable assumptions. Client agrees to promptly notify Siemer if it learns of any material inaccuracy or misstatement in, or material omission from, any information previously delivered to Siemer.

7.      CONFIDENTIALITY. Except as required by applicable law or pursuant to an order entered or subpoena issued by a court of competent jurisdiction or government regulator, (A) Siemer shall keep confidential all material non-public information provided to it by Client, and shall not disclose such information to any third party, other than (A) such of its employees and advisors as Siemer determines have a need to know and (B) prospective purchasers of the Property that execute a customary confidentiality agreement and (B) Client shall not disclose any advice provided to Client by Siemer to any third party other than to its employees and advisors of Client on a need to know basis. For the avoidance of doubt, this paragraph 7 has no effect on any confidentiality agreement previously entered into between Siemer and Client.

8.      INDEMNIFICATION. Client agrees to the indemnification and other obligations set forth in Annex A attached hereto, which Annex A forms an integral part of this Agreement and is incorporated by reference herein.

9.      TOMBSTONES. Client agrees that Siemer may, at its own expense, place announcements and advertisements in financial and other newspapers and journals and on its Internet website describing Siemer's services in connection with this Agreement, in each case, only after the public announcement of any Transaction by Client, if any, subject to any limitations set forth in the Definitive Transaction documents.

10.     CONFLICTS. Client acknowledges that Siemer and its affiliates may have and may continue to have investment banking and/or other relationships with parties other than Client pursuant to which Siemer may acquire information of interest to Client. Siemer shall have no obligation to disclose such information to Client, or to use such information in connection with this Agreement.

11.     REPRESENTATIONS. Each party hereto represents and warrants that (A) it has the power and authority to execute, deliver and perform this Agreement; (B) this Agreement is a binding obligation of such party, enforceable against such party in accordance with its terms, and (C) the execution, delivery and performance of this Agreement by such party shall not violate any rights of, agreements with, or obligations to, any third parties.

12.     ARBITRATION. Any controversy or claim arising out of or relating to this Agreement or the breach thereof (a "Dispute"), shall be decided by mandatory, final and binding arbitration in accordance with the Comprehensive Arbitration Rules and Procedures of JAMS, as supplemented hereby. The parties bind themselves to mediate, and if necessary to arbitrate, any Dispute in Los Angeles County, California. The arbitrator shall be independent of the parties and under no circumstance shall any mediator or arbitrator have any connection to or relationship with either of the parties, or their respective principals or employees. If either party desires to mediate any Dispute, such party shall notify the other party. If the parties are not able to resolve the Dispute within 10 days after a party notifies the other party of its desire to arbitrate (an "Arbitration Notice"), then



within 10 days immediately after the expiration of the aforesaid 10-day period, the parties shall attempt to agree upon an independent arbitrator. Unless both parties can agree in writing on a single arbitrator within 10 days, then, within 10 days thereafter, the parties shall notify the other in writing of the name of the independent arbitrator chosen by them to identify the independent arbitrator. If either party fails to timely give the other notice of such appointment, then the party who timely gave such notice shall be entitled to require that its arbitrator act as the sole arbitrator hereunder. If an arbitrator is timely appointed by each of the parties, the two named arbitrators shall select the independent arbitrator within 10 days after they have both been appointed, and they shall promptly notify the parties thereof. Each party shall promptly notify the other party and the party-selected arbitrators in writing if the independent arbitrator has any relationship to or affiliation with such party (a "Notice of Relationship"), in which event another arbitrator shall be selected within 10 days after receipt of such Notice of Relationship by the party-selected arbitrators. If the two initially appointed arbitrators cannot agree on the independent arbitrator, then either party may request that JAMS select the independent arbitrator, who shall be a retired judge. Arbitration demanded hereunder by either party shall be final and binding on the parties and may not be appealed. The decision, arbitration order and relief agreed upon in writing by the independent arbitrator shall be deemed the decision of the independent arbitrator for all purposes hereof. The parties agree that the independent arbitrator may render and the parties shall abide by any interim ruling that the independent arbitrator deems necessary or prudent regarding discovery, summary proceedings, or other pre-arbitration matters. The parties hereby submit to jurisdiction of the state and federal courts located in Los Angeles County, California, and agree that any such court may enter all such orders as may be necessary or appropriate to enforce the provisions hereof or to confirm any pre-arbitration ruling or decision or any award rendered by the independent arbitrator. Any court of law of California or the United States of America shall enforce the decision of the independent arbitrator in its entirety and only in its entirety; provided, however, that if a court for any reason refuses to enforce any equitable remedies ordered by the independent arbitrator, such refusal shall not affect any damage or attorney fee award made by the independent arbitrator. Any costs or other expenses, including reasonable attorneys' fees and costs incurred by the prevailing party, arising out of or occurring because of the arbitration proceedings may be assessed against the unsuccessful party, borne equally, or assessed in any manner within the sound discretion of the independent arbitrator and shall be included as part of any order or decision rendered by the independent arbitrator. As an initial matter (and until ordered differently by the independent arbitrator in connection with an award), the parties shall each pay the fees, costs and expenses charged by the arbitrator chosen by it, and, in advance, one-half of the fees, costs and expenses charged by the independent arbitrator. The arbitrator shall not have any power to alter, amend, modify or change any of the terms of this Agreement nor to grant any remedy which is either prohibited by the terms of this Agreement or not available in a court of law.

13. MISCELLANEOUS.

   A.  <u>Entire Agreement; Amendments; Assignment</u>: This Agreement supersedes any other agreements or understandings, oral or written, between the parties respecting the subject matter hereof. Amendments to, or waivers of, this Agreement must be in writing and signed by both parties. This Agreement may not be assigned by either party without the written consent of the other party. This Agreement creates no rights in or benefits for any third parties except the "Indemnified Persons" described in Annex A hereto who are expressly made third party beneficiaries of this Agreement.

   B.  <u>Notices</u>: All notices and other communications hereunder shall be in writing, mailed by registered or certified mail, with return receipt requested, delivered by a nationally recognized overnight courier, emailed or hand delivered. Notices and other communications shall be effective: (A) if given by mail, 3 days after deposit in the U.S. mails, postage prepaid, addressed to such party at the address set forth below the signature of such party to this Agreement (or such other address as such party may specify in writing to the other party) (each, an "Address"), (B) if given by courier or by hand delivery, when delivered to the Address of such party or (C) if given by email, when sent to the email specified in the Address of such party.

   C.  <u>Survival; Severability</u>: The agreements and statements contained in Sections 3, 4, 5, 7, 8, 9, 10, 11, 12 and 13 of, and Annex A to, this Agreement shall remain operative and in full force and shall survive the termination of the Agreement. If any provision hereof is unenforceable or invalid, it shall be given effect to the maximum extent it may be enforceable or valid, and such unenforceability or invalidity shall not affect the enforceability or validity of any other provision of this Agreement.

   D.  <u>Choice of Law</u>: This Agreement shall be construed according to the laws of the State of California without giving effect to any provisions relating to conflict of laws.

Client/ ____

4 of 9



E.    Counterparts: This Agreement may be executed in counterparts and by facsimile signature.

\* \* \* \* \*

Agreed to and accepted:

**LOCAL CORPORATION**
7555 Irvine Center Drive
Irvine, CA 92618
Email: fred@local.com

By: _____
Name: Fred Thiel
Title: Chairman & EO

Date: 4/10/15

Sincerely,

**SIEMER & ASSOCIATES, LLC.**
1333 2nd Street, Suite 600
Santa Monica, CA 90401
Email: Ivan.Nikkhoo@Siemer.com

By: _____
Name: Ivan Nikkhoo
Title: Managing Director

Date: 4/10/15



Annex A

SIEMER & ASSOCIATES, LLC

Standard Form of Indemnification Agreement

A.  Client agrees (A) to indemnify and hold harmless Siemer and its affiliates, and the respective directors, officers, agents, and employees of Siemer and its affiliates (Siemer and each such entity or person being referred to as an "Indemnified Person"), from and against any losses, claims, demands, damages or liabilities of any kind (collectively, "Liabilities") relating to or arising out of activities performed or services furnished pursuant to the engagement agreement to which this Annex A is attached Agreement, any Transaction or Siemer's role in connection therewith, and (B) to reimburse each Indemnified Person for all reasonable expenses (including reasonable fees and disbursements of counsel) incurred by such Indemnified Person in connection with investigating, preparing or defending any investigative, administrative, judicial or regulatory action or proceeding in any jurisdiction related to or arising out of such activities, services, Transaction or role, whether or not in connection with pending or threatened litigation to which any Indemnified Person is a party, in each case as such expenses are incurred or paid. Client will not, however, be responsible for any such Liabilities or expenses to the extent that they have resulted primarily from Siemer's bad faith, negligence or willful misconduct. Client also agrees that no Indemnified person shall have any liability (whether direct or indirect, in contract, tort or otherwise) to Client or any of its security-holders or creditors for or in connection therewith, except to the extent that any such Liabilities or expenses incurred by Client have resulted primarily from Siemer's bad faith, negligence or willful misconduct. In no event shall any Indemnified Person be responsible for any special, indirect or consequential damages, except to the extent such special, indirect or consequent damages have resulted primarily from Siemer's bad faith, negligence or willful misconduct.

B.  Client shall not be liable for any settlement of any litigation or proceeding effected without its written consent. Client will not, without Siemer's written consent, settle, compromise, consent to the entry of any judgment in or otherwise seek to terminate any claim, action or proceeding in respect of which indemnity may have been sought hereunder, whether or not any Indemnified Person is an actual or potential party thereto, unless such settlement, compromise, consent or termination includes an unconditional release of each Indemnified Person from any Liabilities arising out of such claim, action or proceeding. If Client enters into any agreement or arrangement with respect to, or effects, any proposed sale, exchange, dividend or other distribution or liquidation of all or significant portion of its assets in one or a series of transaction or any significant recapitalization or reclassification of its outstanding securities, Client shall provide for the assumption of its obligations under this Annex A by another party reasonably satisfactory to Siemer.

C.  If the foregoing indemnification is unavailable or insufficient to hold an Indemnified Person harmless in respect of any Liabilities (or related expenses) referred to therein other than by virtue of the express terms thereof, then, in lieu of indemnifying such Indemnified Person hereunder, Client shall contribute to the amount paid or payable by such Indemnified Person as a result of such Liabilities (and related expenses) in such proportion as is appropriate to reflect the relative benefits to Client, on the one hand, and Siemer, on the other hand, of the Transaction (whether or not any Transaction is consummated) or if such allocation is not enforceable, then on the basis of such relative benefits and also the relative fault of each of Client and Siemer, as well as any other relevant equitable consideration; provided, however, that in no event shall the Indemnified Persons be required to contribute an aggregate amount in excess of the aggregate amount of fees actually received by Siemer under the Engagement Agreement, except to the extent any such Liabilities or expenses to have resulted primarily from Siemer's bad faith, negligence or willful misconduct. For the purposes of the Agreement, the relative benefits to Client and Siemer of the Transaction shall be deemed to be in the same proportion as (A) the total value paid or contemplated to be paid or received or contemplated to be received by the company or its security-holders, as the case may be, in connection with the Transaction or Transactions that are the subject of the Engagement Agreement, whether or not any such Transaction is consummated, bears to (B) the fees paid or to be paid to Siemer under the Engagement Agreement.

Client   "S&A"                                                                                 6 of 9



SIEMER & ASSOCIATES, LLC – PRIVACY POLICY

**Siemer & Associates, LLC – Privacy Policy**

At SIEMER & ASSOCIATES, we are committed to protecting the privacy and security of your non-public personal information. Our goal is to help you understand how we collect and use the information you provide to us. Whether you are a current or former customer, our practices are the same.

**Highlights**
   A. Your non-public personal information is confidential
   B. Information security is a top priority at SIEMER & ASSOCIATES
   C. We do not sell information to third parties
   D. We do not share your non-public personal information with outside parties except as permitted or required by law

**Collection of Information**

We may collect non-public, personal information about you in the following manner:
   A. Personally identifiable information you provide to us on applications and forms, such as income and assets
   B. Information related to your transactions with SIEMER & ASSOCIATES and our affiliates, such as account balances and deposit history
   C. Information we receive from third parties, such as credit reporting agencies

**How We Protect and Use Customer Information**

We maintain physical, electronic, and procedural safeguards that comply with federal standards to secure your non-public personal information. We only grant access to non-public, personally identifiable information about our customers to employees of SIEMER & ASSOCIATES, its affiliates, and third party service providers contracted to assist in the servicing of your accounts. All third party service providers are required to maintain the confidentiality of your information. We will only disclose this information as permitted or compelled to do so by law.

We do not currently share information about you that would trigger an opt-out responsibility, so there is no need for you to opt out at this time. Should that change, we will notify you in advance and provide you with the opportunity to opt out of the disclosure of your information.

If you have any questions about your personal or account information or about Siemer & Associates privacy policies and practices, please feel free to contact us at (310) 861-2100.

**NASD Public Disclosure Information**

NASD Conduct Rule 2280, requires the following information be provided to you: (1) The NASD Regulation, Inc. Public Disclosure Program hotline number is 1-800-289-9999; (2) The NASD Website address is, www.nasdr.com, and (3) The NASD has a brochure available describing the public disclosure program.

**Money Laundering**

To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institution to obtain, verify, and record information that identifies each person who opens an account. What this means for you;
   A. When you open an account, we will ask for your name, address, date of birth and other information that will allow us to identify you.
   B. We may also ask to see your driver's license or other identifying documents.

For any further information regarding these disclosures, please feel free to contact us.

**SIPC Disclosure**

_Client / S&A_

7 of 9



SIEMER & ASSOCIATES is a member of the Securities Investor Protection ("SIPC"), which provides account protection for the net equity of a customer's funds and securities positions. SIPC provides $500,000 of primary net equity protection, including $100,000 for claims for cash ("SIPC Coverage"). Visit www.sipc.org for more information about SIPC Coverage. Account protection applies when a SIPC member firm fails financially and is unable to meet its obligations to its securities customers, but does not apply to losses from the rise or fall in the market value of investments or to SIPC ineligible assets such as futures, foreign exchange transactions, or any investment contracts that are not registered as securities.

Client    S&A

8 of 9

Exhibit 1, Page 22



**SIEMER & ASSOCIATES, LLC – BUSINESS CONTINUITY PLAN (BCP) - DISCLOSURE**

**Siemer & Associates, LLC Business Continuity Planning**

Siemer & Associates, LLC, has developed a Business Continuity Plan on how we will respond to events that significantly disrupt our business. Since the timing and impact of disasters and disruptions is unpredictable, we will have to be flexible in responding to actual events as they occur. With that in mind, we are providing you with this information on our business continuity plan.

**Contacting Us**

If after a significant business disruption you cannot contact us as you usually do at our main office, you should call our alternative number (818) 342-0200.

**Our Business Continuity Plan**

We plan to quickly recover and resume business operations after a significant business disruption and respond by safeguarding our employees and property, making a financial and operational assessment, protecting the firm's books and records, and allowing our customers to transact business. In short, our business continuity plan is designed to permit our firm to resume operations as quickly as possible, given the scope and severity of the significant business disruption.

Our business continuity plan addresses: data backup and recovery; all mission critical systems; financial and operational assessments; alternative communications with customers, employees, and regulators; alternate physical location of employees; critical supplier, contractor, bank and counter-party impact; regulatory reporting; and assuring our customers prompt access to their funds and securities if we are unable to continue our business.

**Varying Disruptions**

Significant business disruptions can vary in their scope, such as only our firm, a single building housing our firm, the business district where our firm is located, the city where we are located, or the whole region. Within each of these areas, the severity of the disruption can also vary from minimal to severe. In a disruption to only our firm or a building housing our firm, we will transfer our operations to a local site when needed and expect to recover and resume business within 48 hours. In a disruption affecting our business district, city, or region, we will transfer our operations to a site outside of the affected area, and recover and resume business within 48 hours.

**For More Information**

If you have questions about our business continuity planning, you can contact us at (310) 861-2100.

Client    S&A

9 of 9

Exhibit 1, Page 23

# EXHIBIT "2"



**David Siemer**

Managing Director
Siemer & Associates, Los Angeles

Mr. Siemer founded Siemer & Associates, LLC in 2007 to fulfill his vision of a true boutique merchant bank that works with technology, software and digital media companies throughout their complete life cycle. In addition to investment banking, he concurrently founded Wavemaker Partners (formerly Siemer Ventures) to assist early growth technology companies to achieve their full potential. One of the most active investment firms in Southern California, Wavemaker supports close to 100 active portfolio companies and makes an average of 20-30 new investments each year in digital media startups.

He was previously with Montgomery & Co. where he served as a key member of the Digital Media Investment Banking Group. In this capacity he led sales to major media companies such as News Corp, Google, Sony, Yahoo!, Hearst,Viacom, WPP and Disney, and he managed equity private placements from multiple venture capital firms and hedge funds.

Mr. Siemer began his career in 1995 at Desco Capital Partners, a Chicago based Internet and software venture fund. Here he managed investments into companies such as: Total Control Products (sold to GE), Conquest Communications (Sold to AT&T), StorageApps (Sold to HP) and Enact Software (sold to Sage SalesLogix).

Mr. Siemer received his M.B.A. in Finance and Economics from the University of Chicago, Graduate School of Business, with high honors. He completed his undergraduate work at Lehigh University with degrees in Management Information Systems and Accounting. He is a General Securities Principal licensed with FINRA/SIPC (formerly NASD).



**Dan Chen**

Managing Director
Siemer & Associates, Los Angeles

Dan Chen brings to Siemer & Associates over 15 years of investment banking, private equity and corporate development experience in the technology, media and telecom industries, and has been involved in transactions totaling over $5 billion in value throughout his career. Dan currently leads and oversees execution of all M&A and capital raising mandates for clients in the software, digital media, advertising, and Internet services space. He is also currently a Strategic Board Member of Lotus Innovations Fund, LP, a private equity firm focused on software investments in the Southern California market, and is part of the mentor team at MuckerLab, advising media and software entrepreneurs in the startup ecosystem in Southern California. Dan's career prior to Siemer spans various roles as investor, operator and advisor to companies. Dan was a key member of the investment team at TPG Capital, where he was involved on cross-border buyout and venture investments in the U.S. and Asia. He participated in the investment activities of TPG's Asian investment funds Newbridge Asia III, LP ($724 million) and Newbridge Asia II, LP ($392 million), and he monitored several portfolio companies in the telecom and Internet services space within those funds. Dan was also Vice President in the media and software groups at Los Angeles-based Montgomery & Co., where he was involved on key transactions with strategic acquirors such as The Walt Disney Co. (Club Penguin) and WPP plc (WildTangent) as well as tech-focused buyout / hedge funds (HBK Investments) and growth / venture capital investors (Scale Venture Partners, Elevation Partners). Most recently, Dan led corporate development activities at a family office-backed investment holding company in Los Angeles where he evaluated and executed on investment opportunities in the healthcare services and IT space.

Dan began his career as an M&A banker at Merrill Lynch & Co. in New York and San Francisco, where he was involved on technology transactions with strategic acquirers in the Internet and financial technology space such as Infospace (now known as Blucora) and Checkfree (acquired by Fiserv), as well as semiconductor companies such as Solectron (acquired by Flextronics) and Xilinx.

Mr. Chen graduated from Yale University with a bachelor's degree in economics. He is a registered General Securities Representative (Series 63 and 79 licenses) with FINRA/SIPC (formerly NASD).



### Ivan Nikkhoo

Managing Director
Siemer & Associates, Los Angeles

Mr. Nikkhoo is responsible for all facets of the practice including business development, deal sourcing, origination, conversion and executing client mandates. He brings to S&A over 27 years of industry experience in various senior capacities both nationally and internationally. Prior to joining the firm, Ivan was the Head of the Technology Practice at Barrington Associates, a division of Wells Fargo Securities, focusing on advising emerging technology companies. Before that, he served as the Managing Director and Portfolio Manager for N3 Technology Fund, a long/short hedge fund co-managed with Dalton Investments. He has also served as the General Manager & Executive VP at SOA Software, responsible for mergers, acquisitions, investments, strategic alliances and joint ventures, as well as President of Vertex Systems, where he was focused on technology strategy, implementation and IP monetization. In addition, he has served as Director of European Operations for TLD Systems in Paris, France, providing software for European space and military projects.

Mr. Nikkhoo is a Wexner Heritage Program Fellow, a member of Young Presidents' Organization and is very active in the tech community. He was a finalist for the E&Y Entrepreneur of the Year Award and serves on the boards of a number of charity and business organizations including the Los Angeles Venture Association (LAVA), LA Chamber of Commerce, USC Marshall Partners,Junior Achievement of Southern California and Cedars-Sinai Medical Center. He is an adjunct professor at the USC Marshall School of Business and has been featured in numerous publications including Fortune Magazine, the Los Angeles Times and the Los Angeles Business Journal. Additionally, Mr. Nikkhoo is a partner at a venture fund focused on investing in emerging technology companies and serves on the boards of several technology companies.

Mr. Nikkhoo received his M.B.A. from the University of Southern California,Marshall School of Business, and his B.S. in Engineering from McGill Universityin Montreal. He is a General Securities Principal licensed with FINRA/SIPC (formerly NASD).

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:  660 Newport Center Drive, 4th Floor, Newport Beach, CA 92660.

A true and correct copy of the foregoing document entitled:  **APPLICATION OF DEBTOR AND DEBTOR-IN-POSSESSION FOR AUTHORITY TO EMPLOY SIEMER & ASSOCIATES AS ITS INVESTMENT BANKING FIRM; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF DAVID SIEMER IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On July 7, 2015, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:  On _____, 2015, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on July 7, 2015, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**Via Attorney Service - Bin outside of Room 5097**
Honorable Scott C. Clarkson
Ronald Reagan Federal Bldg.
411 W. Fourth St.
Santa Ana, CA 92701

VIA E-MAIL: Debtor:  Ken Cragun, CFO – kcragun@local.com;

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| July 7, 2015 | Viann Corbin | /s/ Viann Corbin |
|---|---|---|
| Date | Printed Name | Signature |

-15-

NEF SERVICE LIST

- Nancy S Goldenberg    nancy.goldenberg@usdoj.gov
- Garrick A Hollander    ghollander@winthropcouchot.com, pj@winthropcouchot.com;vcorbin@winthropcouchot.com;mconour@winthropcouchot.com
- Jeannie Kim    jkim@winthropcouchot.com, vcorbin@winthropcouchot.com;pj@winthropcouchot.com
- Peter W Lianides    plianides@winthropcouchot.com, pj@winthropcouchot.com;vcorbin@winthropcouchot.com
- Kyle J Mathews    kmathews@sheppardmullin.com
- David J McCarty    dmccarty@sheppardmullin.com, nparker@sheppardmullin.com
- Andrew S Nicoll    anicoll@porterwright.com
- Brett Ramsaur    bramsaur@swlaw.com, kcollins@swlaw.com
- Michael B Reynolds    mreynolds@swlaw.com, kcollins@swlaw.com
- Scott H Siegel    ssiegel@laklawyers.com, aaguirre@laklawyers.com
- Tiffany Strelow Cobb    tscobb@vorys.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
- Michael A Wallin    mwallin@slaterhersey.com, mrivera@slaterhersey.com
- Marc J Winthrop    mwinthrop@winthropcouchot.com, pj@winthropcouchot.com;vcorbin@winthropcouchot.com

MAINDOCS-#212690-v1-Local_AppEmploySiemerAssociatesInvestmentBank.doc